Okay, Ms. Gardner. Good morning, Your Honors. Thank you. We're here today to contest the board's decision regarding the invalidity of Infineum's patent directed to a novel combination of antioxidant and detergent used in an oil formulation that provided improved and unexpected advantage. On page 42 of the red brief, Afton says that, for the first time on appeal, you raise a new argument that the prior art did not recognize the claimed optimized parameter to be a result-effective variable. Where in the record was this raised below? All throughout the record. We never cited the particular case, but all throughout the record we've contended that the invention is the novel combination of the antioxidant and the magnesium that overcame the boar polish result. We maintained that it wasn't taught by the prior art and I don't believe that we are precluded from citing a new case that wasn't cited originally. It's simply a case that shows what has to be shown for purposes of obviousness that wasn't shown here. We certainly didn't anticipate that the board would make a decision on anticipation in support of its obviousness conclusion. So if it's and I can address obviousness a little bit more later, I'd first like to address the anticipation. On page 11 of the red brief, Afton says it's uncontested that a person's skill would formulate compositions that meet industry standards including those set forth in ACEA 2004. Do you agree with that? We agree that the whole point of innovation in this industry by all of the parties and all the players is try to formulate to meet specifications that doesn't address anything having to do with how you meet those specifications. So again, if you'd like to discuss obviousness first, we can go to specification is a specification with performance goals. It's a challenge. What I'd like to do is address my questions. Okay. On page 14 of the red brief, Afton says it's undisputed that Nicholson teaches an example for a formulation comprising a magnesium detergent and a combination of aminic and phenolic antioxidants. Do you Those are sort of housekeeping. I want to know whether they're disputed or not. Turning to anticipation, there is no substantial evidence cited by the board nor existing in the record to support the board's holding of anticipation by examples five and six of the COPA reference. So the COPA we're talking about use ingredients that people can get off the shelf and combine in varying amounts. However, the fact that the components are known components doesn't negate against invention. Both parties employ 50 to 100 PhD scientists to constantly come up with formulations that can meet the new and ever-challenging performance criteria that are put forth by The challenge is always to meet the performance goals of specifications, to meet the performance goals presented by new innovations in engine technology, and you know how do we combine the various components to do that. So COPA is a reference from 1988, which is about 20 years before the idea of boar polish was One doesn't need to think about new innovations. We're just trying to figure out That is correct, Your Honor. And am I understanding right that this issue, maybe even the only dispute between you and the other side, is whether this reference to a commercially available product does the trick on a particular claim element or doesn't do the trick? That's correct, Your Honor, because we're only focusing on a particular example in the specification of COPA. We're not focusing on the overall teaching as some sort of prior invention or a teaching that is describing and enabling an invention. The question is whether or not this particular comparative example that was run in 1988 happened to happen to have coincidentally fallen within the scope of what Infinium has now claimed, and thereby it's an anticipation almost by accident. So the burden for Afton is to demonstrate that each element is either expressly present in that example or inherently present. Let me ask you that. Cochlear discloses examples that include a base stock of lubricating viscosity, antioxidants, and magnesium sulfonate detergent having a TBN of 400, and contributing 0.15 weight percent magnesium to the total mass of the composition. You'd agree with that? Yes. The only dispute with respect to COCLA is whether or not the antioxidant component of the claims is met. So COCLA discloses antioxidant limitations. The components F and G of the examples 5 and 6 met the claim range of at least 0.6 mass percent up to 3.0 mass percent. Yes? No. So that is where the dispute lies. So with respect to the antioxidant limitation, there are two antioxidants recited in examples 5 and 6 of COCLA. Antioxidant F and antioxidant G. And there's no dispute about antioxidant F. It's antioxidant G, and I have to also say that we need a correction on page 12 of our brief where we say it's 0.4% of G and 0.4% of F. It's actually 0.4% of G and 1% of F. But that is reflected throughout all of the briefing. But the issue is whether or not, what is 0.4% of G? What is taught by that? And is that teaching an amount of aminic antioxidant such that when you add F and G, the total amounts of those antioxidants falls within the scope of the claims range? And so that's the issue. And it has to either be expressly stated, or it has to be inherently stated. Now, in its petition, and in its expert declarations, Afton took the position that component G is the commercial product Ergonox L57. They took that position. They said it's clearly taught by COCLA. In fact, the reason... Where's the clearest place in the petition? The language of COCLA itself rather helps them. Well, OK. Because it says the name of the substance commercially available from. And that's a little hard for me to see how that cannot reasonably be read, even if it's not unambiguously read, but referred to the substance as opposed to the particular version of it that at a given moment is available from that company. So there's no dispute that COCLA says use an aminic antioxidant in G. It does. It says use an aminic antioxidant. And these aminic antioxidants are available from different sources. They're cited in this Infinium specification, the types of antioxidants that you can use. They come off the shelf, and they have different amounts of aminic components in them off the shelf. Now, in stating that you use 0.4% of an aminic antioxidant, that specification does not state how much, whether or not that's pure aminic antioxidant or not. And the reason COCLA doesn't state that is because it's completely unimportant to COCLA. This is a comparative example, and all COCLA is reporting on is what they made when they made example five to compare it to the nice things that it was happy about in the other example. So they're reporting on what they made. And they said, we use an aminic antioxidant, commercially available as Ergonox L57. When Mr. Steyer, Afton's expert, repeated the example, he did not use 0.4% of pure aminic antioxidant, which is what's required by the claims. He grabbed Ergonox L57 off the shelf. He never tested it to find out what his purity was before he used it. He used 0.4% of it. He added it to the composition, and then he didn't test the composition at the end to find out how much aminic antioxidant was actually in the end product. He used 0.4% of the commercial product, per what Afton says is COCLA's clear teaching. They say this in their reply brief to the board at A385. Mr. Steyer made the example in COCLA, per COCLA's clear teaching. Dr. Lamb states that component G in his expert report, component G is Ergonox L57. And that's at appendix 896 to 897. So there's no dispute amongst the facts in the case that all of the experts, when they read COCLA, read COCLA as teaching that we use B, aminic antioxidant, commercially available, is Ergonox L57 when we made this example. And there's no teaching beyond how much you should use or other things you could use, because there's no teaching about this example at all. It's a comparative example of one thing. You're well into your rebuttal time. You might want to touch obviousness before you... Okay. Let's go here. So just quickly, Nicholson is a very similar thing. We're talking about an errant example in an old prior art reference here, a reference from 1995. The analysis with respect to Nicholson is virtually the same as the type of analysis with respect to COCLA. The difference is, and this highlights the significance with respect to COCLA, the difference is that Afton had to acknowledge that nothing like Ergonox L57 was mentioned in the example with respect to the magnesium-containing detergent. The only statement with regard to the magnesium-containing detergent was that it is an alkaline-benzene-magnesium sulfate and not any specific compound. So Dr. Lamb had to take the position, since he couldn't just take Ergonox L57 off the shelf like he did for... like Mr. Steyer did for COCLA, he was going to have to talk about all the different possible magnesium sulfonates that might have been able to be used in that example. He said something about a 400 TBN over-based magnesium detergent, right? Yes, and there are many different ways to get that. And he goes through four pages of summary as to how you might get that by using various commercial products. He identifies commercial products that are not even prior art and basically draws the conclusion of obviousness from that. And I'd like to reserve time if I may. May it please the Court, Matthias Ferrario for Afton Chemical. In attempting to retry this case, Infinium seeks to take from the marketplace compositions that have used high amounts of magnesium and high amounts of antioxidant. These are two common additives for HDD or heavy-duty diesel lubricants that are seen throughout the art. So in my time today, I'd like to address three things. One is the board was correct when it found that COCLA expressly disclosed using 0.4 weight percent of alkylated diphenyl amine. I want to do a little housekeeping question for you. I asked your opposing counsel about your statement on page 42 of the red brief that for the first time on appeal, they raised a new argument. And she says it's not newly raised. And I want to give you an opportunity to address that before you get into your argument. Thank you, Your Honor. Yes, it is newly raised. So from our perspective, in the EI DuPont case where it sets forth a variety of ways or a number of different arguments that somebody can raise in an obviousness inquiry, result effective variable is its own thing. It has its own attendant requirements, namely that you need to show or point to prior art that understood that the result effective variable existed in the prior art, sort of an attendant requirement to that type of argument. We never had that. We never had the opportunity to show and explain to the board that there is no result effective variable because they never raised it in that fashion. Now, there is, and the board never had an opportunity to make the finding because it wasn't in front of them. So that, from our perspective, is a waiver. Now, even if there isn't a waiver, we believe that there still is no result effective variable because Dr. Lamb explained that people of skill in the art knew that magnesium caused oxidation and oxidation could be ameliorated by antioxidants. That's fine. From my perspective, the gray brief sort of flapped around in response to your waiver argument, and I wanted both sides to address that. Now, with respect to Cole Clough, Your Honors, we believe that it could not be clearer that the express grammar within the four corners of the document, that it's... It could be clear. The reason there's an argument is that it's not as clear as it might be, whether it's referring to a commercially available product or to the substance, which might be available in a number of places or might have to be created, but is, by the way, if you're interested, how we got ours from the commercially available place. And from our perspective, with all due respect, component G is, uses that verb first, so from the grammar, it says it is an alkylated diphenylamine. The phrase commercially available indicates the one potential source of that chemical, not the amount, not the 0.48% of a particular chemical. Was your original theory and your petition predicated on Ergonox L57 being additive G? No, absolutely not. In fact, I thought I heard Infinium state that, but in 894, our petition says that these examples use ashless aminic and sulfur-free phenolic antioxidants, not that they use Ergonox. And the statement referred to regarding, with respect to Dr. Lamb that was referenced is not as clear as I think Infinium would have you believe, because in fact, it says what I believe is something quite different. There are two sentences in Dr. Lamb where he talks about Ergonox and does not say, I'm sorry, where he talks about the antioxidant, and in one sentence he says, the antioxidant is an alkylated diphenylamine. And you can find that at 897. 897. Alkylated diphenylamine antioxidant, which is used as a component G by Coke Law. Now, importantly, we think the board understood and considered all this evidence. They looked at the four corners of the reference. They then, we don't think you need to go outside to the extrinsic record, but they then did, and we were the only ones that provided a product technical data sheet from the relevant time period, and that product technical data sheet said that the antioxidant, the commercial one, was not diluted. It was not diluted or contained no diluents. Now, that's the only evidence of record from the time frame, and that's a product technical data sheet, and the board considered all that evidence, including the evidence that Infiniium raised, out-of-date MSDS data sheets, which our experts said people don't rely on to understand the purity of an antioxidant, and it considered all that, and it weighed that, and it made the findings very clearly in its final written decision that Colcloth disclosed an alkylated diphenylamine at .4 weight percent, and when that .4 weight percent was added to the other antioxidant that was disclosed in Colcloth, it adds up to the .7, which falls right within that. Is that a finding, in your view, a finding of inherency, a finding of express disclosure, or some third thing which may not doctrinally exist? Well, my belief is it's an express disclosure, and Colcloth says .4 weight percent of an alkylated diphenylamine. And what was the evidence you said said no dilutants? That was a product technical data sheet for the commercially available Organoxel-57, which was the trade name, which was identified as a potential source for the alkylated diphenylamine. And is it the express meaning of no dilutants that this is 100% of the aminic substance, or might that mean something different? Yes. Our view is that it does not mean something different, that it is an express. Leading us out of your view, what record evidence is there that says that? So there is testimony from Mr. Steyer, who says that based on his experience in the field, when he sees that something says no diluents, that it's effectively 100% active. Dr. Lamb, I believe, similarly recognized that the product data sheet said no diluents, and that it was effectively a neat amount, I think is what he said during his deposition. So neat without a diluent, yeah. I think it's actually a chemical term as well. Okay. Yes. Now, I want to address Nicholson and ASEA 2004, as we have been pronouncing it. So ASEA 2004 refers to, or relates to European marketplace, which is a large commercial marketplace, and sets limits on a variety of parameters, including bore polish, including fluoroelastomer seal protection, and including cylinder wear. These limits are important for people that want to sell lubricating oils in this market. Now, Nicholson is a reference, which specifically talks about a lubricant that passes a fluoroelastomer seal test, the same test that's part of ASEA 2004. Nicholson tells you, and the board found this, that Nicholson is a good fluid for cylinder wear, that it shows excellent properties and dispersancy, and recognizes that these characteristics are important for somebody who wants to sell to a marketplace. So in light of those findings, which the board made, we think it was absolutely permissible for the board to combine those references. Now, Nicholson, I think, is important to note that it has everything, everything that is part of the composition of the 274 claim. Everything. It has the detergent, has the antioxidant, has the lubricating base oil. So why is Nicholson a 103 obviousness combination? And the reason for that, and the board understood this, and the board followed Dr. Lam's reasoning here, and our reasoning, is that when it comes to the magnesium detergent, and I just want to make clear, I think I heard reference to Ergonox L57. Those are two different things. The Ergonox L57 is the antioxidant, and then the magnesium detergent is a separate thing. But when it comes to the magnesium detergent in Nicholson, it's described in that specific example as having a particular TBN, total base number. And that refers to sort of basicity. It's a measurement of how basic this thing is. And what is missing from Nicholson, as we stated, is that in that example, doesn't tell you is what is the weight percent of the magnesium? How heavy is it? How much physical stuff are you putting in there, right? And that's a limitation of the claim. It says the claim in the 274 patent says use 0.05 weight percent of magnesium. So to understand how Nicholson, or what Nicholson is disclosing, Dr. Lam went through the exercise very clearly of explaining TBN, because it refers to a certain amount of activity, basicity of activity. You have to, and can, and he did, calculate different flavors of magnesium detergent that one could use to understand how much magnesium would be delivered. And he goes through that exercise. And what he shows, and what the board accepted, was that on the lower end, you must have a certain minimum amount of magnesium to get to 400 TBN, and sort of your most permissive type of detergent. And that he calculated, I think, I believe it was some 8.2 weight, or percent of some type of magnesium, and that would get you a minimum amount, the right amount that was disclosed in the claim. Now, he also showed how most conventional detergents that were out there, including detergents sold by Infineon, including detergents sold by us, they all tend to gravitate at about the 9.2 range. All of those are considered 400 TBN detergents. So you've got these class of detergents out there that are sold commercially and used regularly, and they're all sort of zeroed in on 9.2. They deliver 400 TBN. All of those get you the right amount of magnesium if you carry through the calculation. The reason we did not argue that Nicholson was an anticipatory reference was the simple fact that we could envision theoretically at the max end of some theoretical exotic species of magnesium detergent, where one might deliver so much magnesium, even at 400 TBN, that the other constraint in the claim, the sash limitation, could get exceeded. In other words, then we'd be hearing arguments about, well, Nicholson can't anticipate because we've come up with some exotic species of detergent that if used, delivers 400 TBN, but then exceeds the sash value. That's all it, and that's it, that's it. Nicholson is right on top of this. It is an obviousness combination with ASEA. ASEA provides some light guidance in terms of don't exceed the sash value. All the conventional detergents used at this time would have delivered the right amount of magnesium that meet the limitation of the claim. No other parts of Nicholson are contested or. So the theory is if you use a conventional 400 TBN magnesium detergent, not only is that gonna lead you to the weight amount limitation for magnesium, it's also going to meet the sulfated ash limit as well? Yes. I'd like to reserve the rest of my time for rebuttal, unless there are further questions. Oh, I don't get rebuttal on the, oh, sorry, no sir reply. All right, well then I'll continue, because I wanna address unexpected results, and I know I don't have much time. I wanna say that really it was Infiniium's burden to identify the closest prior arc here, and they didn't do that. Even notwithstanding that, our view is the board did in fact consider those results and found them not persuasive. We note that they said at APPX 25 that the results were weak at best, and that's because there's all kinds of problems associated with the data. You can see that reflected in the oral transcripts at A624 to 628 and A645 to 48. The data simply does not support any unexpected results. Thank you, Your Honor. Thank you, thank you. Your Honor, I would like to direct your attention to the Infiniium patent, column six, lines 41 to 44. This is the portion of the patent where Infiniium lists the types of aminic antioxidants that one might be able to use for the invention, and it lists various antioxidants, one of which is an Ergonox product, L-135, I think at that point, but importantly, it says for the purposes of comparisons below, meaning the comparisons to the other examples and specification, the concentration and weight percent of each is based on 100% active material. So Infiniium is teaching in this patent and is claiming when it says 0.4% of aminic antioxidant, the types of antioxidants specified, it's saying 0.4% of that active material, not 0.4% of whatever commercial product you might pull off the shelf. That is the problem with Cochlea. Cochlea doesn't do that, and it is not correct that until we took the depositions of the experts that Afton ever took a position other than Ergonox L-57 met the, was described by Component G. In fact, the passage that counsel referred your honors to on 897, he omitted the first part of the sentence, which is, Dr. Lamb, their expert, states, further, the specific aminic antioxidant used by Cochlea as Component G is Ergonox L-57, comma, an antioxidant exemplified by the claims. It is an aminic antioxidant. The issue is, how much is Cochlea teaching you to use? Cochlea's not teaching you to use anything. It's just an example. So the question is, is it necessarily 100% pure aminic antioxidant? No, it's not. This diluent argument is a straw man. There's no argument here that Ergonox L-57 should be diluted or was diluted. It's undiluted, pure Ergonox L-57 is not gonna meet this claim. Quickly on obviousness, no obviousness analysis was done in this case, no assessment of the scope and content of the prior art, the known problem of using magnesium detergents, no fact finding of the motivation to change or assess the examples in Nicholson. And quickly, the analysis that was done by Dr. Lamb is not prior art. If we look at his expert reports, he's citing to art that post-dates the invention  Thank you, your honors. Thank you.